IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2020

## STATE OF TENNESSEE v. TRIN VILLA SUTTLES, III

**Appeal from the Criminal Court for Hamilton County**
**No. 304562    Barry A. Steelman, Judge**

_____

### No. E2019-01392-CCA-R3-CD

_____

The defendant, Trin Villa Suttles, appeals his 2019 Hamilton County Criminal Court guilty-pleaded conviction of leaving the scene of an accident, arguing that the trial court erred by ordering that he serve his sentence of 11 months and 29 days in confinement. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Lloyd A. Levitt, Chattanooga, Tennessee, for the appellant, Trin Villa Suttles, III.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Neal Pinkston, District Attorney General; and Andrew Coyle, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Originally charged with two counts of leaving the scene of an accident and two counts of failure to render aid based upon his striking the victim, Shirley Thomas, with his car, the defendant pleaded guilty to one count of leaving the scene of an accident in exchange for dismissal of the remaining charges and a sentence to be determined by the trial court following a sentencing hearing.

No transcript of the guilty plea submission hearing was included in the record on appeal. Generally, the absence of the transcript of the plea submission hearing would render the record inadequate for plenary appellate review of the sentence. In this case, however, both the defendant and the victim testified at the sentencing hearing, and the State

introduced into evidence a video surveillance recording that captured the offense. Under these circumstances, the record is adequate for our review.

At the sentencing hearing, Shirley Thomas testified that on September 6, 2017, when she was 75 years old, she drove to the Target on Gunbarrel Road in Chattanooga to pick up her prescription medication. She described what happened: "I parked my car and got out and was going across the walkway, and he hit me. I saw a blue hood. He hit me, and I went down like this. And then he backed up and I fell on the pavement then, and he left." Ms. Thomas said that she did not see the driver, but she recalled that "someone chased him and got the tag number, and the police had the tag number even before the ambulance came."

Ms. Thomas testified that she sustained a broken big toe, a fractured leg, and an injury to her shoulder. She spent a week in the hospital before being transferred to "Siskin rehab," where she remained until December 5, 2017. Ms. Thomas described her time following the accident as "a long time, a very painful time," recalling that "[t]hat leg, every time I moved it, I was screaming." She said, "I tell you, the pain was terrific." Her medical bills totaled some $43,000, which amount was paid by "Medicare and a supplement." She said that, before the accident, she "used a cane for balance" but that since the accident, she must use "a walker all the time." Her husband had to install an elevator so that she could get into her home. Ms. Thomas said that she "use[s] a wheelchair in the house" and that, since the accident, she was no longer "able to do the housework like I used to do."

Ms. Thomas said that she felt that the defendant "needs to be punished," because he left her "flat on my back" after hitting her with his car.

The 47-year-old defendant apologized to the victim, saying that he was "deeply sorry." The defendant testified that on the day of the accident, he was looking for his 22-year-old son, who was living with the defendant at that time. The defendant said that his son "had stole some money from me, and they told me that he was with his friends and where they was headed." The defendant recalled that he was looking in the parking lot for his son "and then I looked back and Miss Shirley was right there." The defendant said that he "panicked and took off" after striking the victim with his car. He drove to a friend's house but eventually turned himself in after learning that the police were looking for him. He was booked into the jail and then released on bond after "some hours."

The defendant said that he lived with his sister, nephew, and "a brother who can't talk she got custody of." The defendant himself had nine children, all but two of whom were adults. The defendant said that his 13-year-old son lived with him and was a big part of his life. He worked at Ken Garner Manufacturing doing "body work and paint"

on "the obstacles is what they call it. What it is is a weight that fit[s] on the back of a backhoe or tractor to keep the balance." The defendant testified that he had been on medical leave because he broke both of his legs in a car accident in March 2019 and that he had to use a cane to walk. He said that, at the time of the sentencing hearing, he was still going for physical therapy once a week. He asked that, should the court order a period of incarceration, he be permitted to serve it on weekends so that he could keep his job.

The defendant acknowledged having a somewhat significant criminal history, explaining that, early in his adulthood, he rebelled against his military father. He also conceded that he had convictions of domestic assault that stemmed from the tumultuous relationship with the mother of some of his children. The defendant admitted that, during the pendency of this case, he had been charged with indecent exposure for an incident that occurred in the Walmart parking lot. He said that he did not drink or use drugs.

During cross-examination, the defendant maintained that he had "tried to look [the victim] up" so that he could apologize to her, "but I didn't have no success with it." The defendant acknowledged that he had previous convictions for domestic assault, aggravated stalking, and voluntary manslaughter. The defendant admitted that the sentence of probation that had been imposed for his conviction of aggravated stalking was revoked when he sent flowers to his probation officer and signed the card from "the alpha male." The defendant conceded that he had a felony conviction in Georgia for "spectating at a dog fight." He also admitted that he had over 50 traffic citations.

The defendant testified that the car he was driving at the time of the offense belonged to a friend, explaining that he drove to his friend's place of business, got her car, took the car through the car wash, and then went to the Target to look for his son. After hitting the victim, the defendant drove back to his friend's place of business and parked her car in the back of the facility. He acknowledged that his friend did not know that he had taken her car but insisted that he had taken the car "to just surprise her" and not "to do nothing devious."

The defendant admitted that, while this case was pending, he was arrested for committing indecent exposure in the parking lot of the Target on Gunbarrel road. On that occasion, he was driving a car that his cousin had rented for him to drive another of his sons to Nashville. Before taking his son to Nashville, however, the defendant went to the Target to pick up a "friend that [he had] been having sex with." The defendant said that he had his penis outside of his pants and was in the process of "[p]utting this lube stuff on" "[b]ecause I was fixing to pick her up" and wanted to be ready for their sexual encounter. The defendant denied that the officers caught him with his shorts around his knees. He acknowledged that officers actually pulled him over in the parking lot of the

-3-

Hamilton Place Mall, explaining that he drove to the mall when he did not see his friend in the Target parking lot.

The surveillance video from the Target taken on the day of the offense shows the defendant striking the victim with a car before backing up and driving away.

The trial court found that the defendant had a lengthy history of criminal conduct, noting that the defendant's criminal history spanned more than 25 years and included convictions for voluntary manslaughter, driving on a revoked license, cocaine possession, causing pit bulls to fight, domestic violence, criminal trespass, aggravated stalking, and indecent exposure. The court noted that the presentence report, which was exhibited to the hearing, established that the defendant had 53 prior driving-related convictions. The court concluded that measures less restrictive than confinement had been applied unsuccessfully to the defendant as demonstrated by the fact that the defendant's probation had been revoked on a previous occasion and that he garnered his indecent exposure conviction while on bond in the present case. The court found that the victim was particularly vulnerable at the time of the offense due to her age and the fact that she was walking with a cane. The court concluded that the injuries inflicted on the victim were particularly great. In mitigation, the court observed that the defendant had apologized to the victim. Based upon these findings, the court imposed a sentence of 11 months and 29 days and ordered the defendant to serve the entirety of the sentence in the workhouse.

In this appeal, the defendant challenges the propriety of the sentencing decision of the trial court, arguing that the court erred by finding that the victim was particularly vulnerable and by imposing a sentence of continuous confinement. The State contends that the sentence is appropriate.

Misdemeanor sentencing, in contrast to felony sentencing, is covered by Code section 40-35-302, the terms of which afford the trial court considerable flexibility in setting the length and manner of service of the misdemeanor sentence. *See* T.C.A. § 40-35-302. For example, a separate sentencing hearing is not mandatory in misdemeanor cases, and the enhancement and mitigating factors need only be considered when calculating the percentage of the sentence to be served "in actual confinement" prior to "consideration for work release, furlough, trusty status and related rehabilitative programs." *Id.* § 40-35-302; *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998). Although our supreme court has not yet applied the standard of review adopted in *State v. Bise*—abuse of discretion coupled with a presumption of reasonableness—to misdemeanor sentencing decisions, it has stated, "The abuse of discretion standard, accompanied by a presumption of reasonableness, is the appropriate standard of appellate review for all sentencing decisions." *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013); *see also State v. King*, 432 S.W.3d 316, 324-25 (Tenn. 2014) (holding that, because "*Bise* and its progeny

establish that the abuse of discretion standard of appellate review accompanied by a presumption of reasonableness applies to all sentencing decisions," the *Bise* standard is the appropriate standard of appellate review for a trial court's sentencing decision to either grant or deny judicial diversion"). Consequently, we join the other panels of this court that have held that the *Bise* standard similarly applies to appellate review of misdemeanor sentencing. *See, e.g.*, *State v. Willard Hampton*, No. W2018-00623-CCA-R3-CD, slip op. at 17-18 (Tenn. Crim. App., Jackson, Mar. 12, 2019).

Because the record establishes that the trial court complied with the requirements of Code section 40-35-302 relative to misdemeanor sentencing, we "apply a presumption of reasonableness" to the sentencing decision in this case. Given the latitude afforded to trial courts in misdemeanor sentencing, the record reflects a basis for requiring confinement in this case. The trial court emphasized the defendant's extensive criminal history, particularly his myriad driving-related convictions, and his failures to comply with sentences involving release into the community, noting that the defendant committed indecent exposure while on bond in this case. Because the evidence supports the conclusions of the trial court, we discern no error in the trial court's sentencing decision.

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE